T.C. Memo. 2007-171

UNITED STATES TAX COURT

RIVER CITY RANCHES #1 LTD., JEFFRY BERGAMYER, TAX MATTERS
PARTNER, RIVER CITY RANCHES #2 LTD., JEFFRY BERGAMYER,
TAX MATTERS PARTNER, RIVER CITY RANCHES #3 LTD., JEFFRY
BERGAMYER, TAX MATTERS PARTNER, RIVER CITY RANCHES #4 LTD.,
JEFFRY BERGAMYER, TAX MATTERS PARTNER, RIVER CITY RANCHES #5
LTD., JEFFRY BERGAMYER, TAX MATTERS PARTNER, RIVER CITY RANCHES
#6 LTD., JEFFRY BERGAMYER, TAX MATTERS PARTNER, ET AL.,[1]
Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent[*]

---

[1]Cases of the following petitioners are consolidated
herewith: River City Ranches #2, J.V., Jeffry Bergamyer, Tax
Matters Partner, docket No. 4876-94; River City Ranches #3, J.V.,
Jeffry Bergamyer, Tax Matters Partner, docket No. 9550-94; River
City Ranches #5, J.V., Stephen Hughes, Tax Matters Partner,
docket No. 9552-94; River City Ranches 1985-2, J.V., Jeffry
Bergamyer, Tax Matters Partner, docket No. 9554-94; River City
Ranches #3, J.V., Jeffry Bergamyer, Tax Matters Partner, docket
No. 13595-94; River City Ranches #5, J.V., Stephen Hughes, Tax
Matters Partner, docket No. 13597-94; River City Ranches 1985-2,
J.V., Jeffry Bergamyer, Tax Matters Partner, docket No. 13599-94;
River City Ranches No. 4, Ltd., Jeffry Bergamyer, Tax Matters
Partner, docket No. 14038-96.

[*]This opinion supplements our previously filed Memorandum
Findings of Fact and Opinion in River City Ranches #1 Ltd. v.
Commissioner, T.C. Memo. 2003-150, affd. in part, revd. in part
and remanded 401 F.3d 1136 (9th Cir. 2005).

Docket Nos.   787-91,  4876-94,    Filed July 2, 2007.
              9550-94,  9552-94,
              9554-94, 13595-94,
             13597-94, 13599-94,
             14038-96.


Montgomery W. Cobb, for petitioners.

Terri A. Merriam, for participating partners in docket Nos. 9554-94 and 13599-94.

Catherine J. Caballero, Thomas N. Tomashek, Gregory M. Hahn, Nhi Luu, and Dean H. Wakayama, for respondent.


SUPPLEMENTAL MEMORANDUM FINDINGS OF FACT AND OPINION

DAWSON, Judge:  These cases are now before the Court on remand from the U.S. Court of Appeals for the Ninth Circuit. River City Ranches #1 Ltd. v. Commissioner, 401 F.3d 1136 (9th Cir. 2005) (River City Ranches II), affg. in part, revg. in part and remanding T.C. Memo. 2003-150 (River City Ranches I).  The Court of Appeals concluded that we erred in holding that we lacked jurisdiction to make findings concerning the character of the partnerships' transactions for purposes of the penalty-interest provisions of section 6621(c)[2] and mandated that we make such findings.  The Court of Appeals also directed us to permit

---

[2]Unless otherwise indicated, section references herein are to the Internal Revenue Code in effect for the taxable years in issue, and Rule references are to the Tax Court Rules of Practice and Procedure.

petitioners additional discovery limited to whether Walter J.
Hoyt III (Hoyt), then the tax matters partner (TMP), executed
consents to extend the limitations periods while disabled by
conflicts between his own interests and those of his partners,
and for any necessary retrial following such discovery.

Pursuant to the remand, petitioners deposed three present
and/or former employees of the Internal Revenue Service (IRS),
respondent made available to petitioners his entire store of
documents that had not been produced earlier, and the Court held
a second trial.

We must now decide two issues.  First,[3] in the following
cases, we must make factual findings regarding whether the sheep
partnership transactions were tax-motivated transactions (i.e.,
whether the transactions or the partnerships themselves were
shams and/or whether there were asset overvaluations and basis
overstatements) for purposes of the section 6621(c) penalty-
interest provisions:

---

[3]Normally, before deciding other issues we would decide
whether the period of limitations on assessment had expired when
respondent issued the notices of final partnership administrative
adjustment (FPAAs).  However, the parties agree that the FPAAs
for the partnerships' 1986 taxable years were timely issued, and
we must decide the sec. 6621(c) penalty-interest issue for that
year in all events.  Since findings as to whether the partnership
transactions or the partnerships themselves were shams and/or
whether there were asset overvaluations and basis overstatements
for purposes of the sec. 6621(c) penalty-interest provisions are
factors to be considered in deciding the limitations period
issue, we will decide the sec. 6621(c) issue first.

| Partnership | Year | Docket No. |
|---|---|---|
| River City Ranches #1, J.V.[1] (RCR #1) | 1986 | 787-91 |
| River City Ranches #2, J.V. (RCR #2) | 1986 | 787-91 |
| | 1987 | 4876-94 |
| River City Ranches #3, J.V. (RCR #3) | 1986 | 787-91 |
| | 1987 | 9550-94 |
| River City Ranches #4, J.V. (RCR #4) | 1984 | 14038-96 |
| | 1986 | 787-91 |
| River City Ranches #5, J.V. (RCR #5) | 1986 | 787-91 |
| | 1987 | 9552-94 |
| | 1988 | 13597-94 |
| River City Ranches #6, J.V. (RCR #6) | 1986 | 787-91 |
| River City Ranches 1985-2, J.V. (RCR 85-2) | 1987 | 9554-94 |
| | 1988 | 13599-94 |

[1]Petitioners use the designations of "Ltd." and "J.V." interchangeably. For convenience, we use J.V. as used by the parties in their briefs.

Second, we must decide whether the period of limitations on assessment had expired when the notices of final partnership administrative adjustment (FPAAs) were issued in the following cases:[4]

---

[4]In River City Ranches #1 Ltd. v. Commissioner, 401 F.3d at 1144 n.5. (River City Ranches II), the Court of Appeals stated that the record before it did not clearly identify which FPAAs were filed within the default limitations periods and which were filed under the disputed extensions. The parties agree that the FPAAs in the above-listed dockets were issued after the expiration of the 3-year default limitations period had expired. FPAAs filed in other dockets before the Court of Appeals were issued within the 3-year default limitations period.

| Partnership | Year | Docket No. |
|---|---|---|
| RCR #2 | 1987 | 4876-94 |
| RCR #3 | 1987 | 9550-94 |
|  | 1989 | 13595-94 |
| RCR #4 | 1984 | 14038-96 |
| RCR #5 | 1987 | 9552-94 |
|  | 1988, 1989 | 13597-94 |
| RCR 85-2 | 1987 | 9554-94 |
|  | 1988, 1989 | 13599-94 |

In deciding this issue we must decide whether the consents to extend the periods of limitations were invalid because Hoyt signed them while disabled by conflicts of interest known to respondent.  Alternatively, if the consents were invalid, we must decide whether the 6-year period of limitations on assessment under section 6229(c)(1) applies because of fraud.[5]

---

[5]In the second amendment to the answer, respondent raised the application of the 6-year period of limitations on assessment under sec. 6229(c)(1) as an alternative to the argument that the consents were valid.  The issue was tried and briefed in River City Ranches I.  In River City Ranches I, we held that petitioners did not prove that the consents were invalid and, therefore, we did not decide whether the 6-year limitations period under sec. 6229(c)(1) applied.  The parties have briefed the issue again on remand.

FINDINGS OF FACT

We incorporate by reference the findings of fact contained in River City Ranches I and River City Ranches #4, J.V. v. Commissioner, T.C. Memo. 1999-209, affd. 23 Fed. Appx. 744 (9th Cir. 2001).[6]  Some additional facts have been stipulated, and they are so found.  We incorporate by reference the Twelfth Stipulation of Facts and the accompanying exhibits.

A.    Formation and Operation of the Sheep Partnerships

From about 1971 through 1998, Hoyt organized, promoted to thousands of investors, and operated as a general partner more than 100 cattle breeding partnerships.  Around 1978 or 1979, Hoyt became interested in the possibility of organizing sheep breeding partnerships similar to the cattle breeding partnerships.

Hoyt did not have a separate prospectus for each of the sheep partnerships.  Instead, he used the same promotional materials he had prepared for the cattle partnerships.  And the promotional materials used to market the investments focused heavily on the investors' tax savings.  One brochure titled "The 1,000 lb Tax Shelter" highlighted the investors' writeoffs, referred to the investment as a tax shelter, and emphasized that the primary return on an investment in a Hoyt partnership would

---

[6]During the original proceedings, the Court took judicial notice of the facts and record in River City Ranches #4, J.V. v. Commissioner, T.C. Memo. 1999-209, affd. 23 Fed. Appx. 744 (9th Cir. 2001).

be from the tax savings. Another brochure, bearing the heading "Harvesting Tax Savings by Farming the Tax Code", also emphasized tax savings and explained that the investment could be financed from the investors' tax savings, which the investors otherwise would have paid to the IRS.

The partnership interest and the resulting flowthrough partnership deductions were "purchased" with 75 percent of the individual's tax savings resulting from the flowthrough partnership deductions. The 75-percent tax savings were determined by first computing an individual's tax liability without participation in a Hoyt partnership and then computing the individual's tax savings using the Hoyt partnership loss. The difference in the two calculations was the individual's tax savings, of which 75 percent was paid to the Hoyt organization and 25 percent was to be retained by the individual. In addition, in the initial year of investment, amended returns claiming refunds were often filed for the individual's prior 3 taxable years. The Hoyt organization received 75 percent of such refunds, and the individual retained 25 percent. Each year the individual's payment to the Hoyt organization was adjusted to reflect the 75/25 split. Because the investment was based on "tax savings" and not on original cash outlay, Hoyt's partnership scheme essentially paid for itself.

The partners' individual income tax returns were often prepared first by the Hoyt Tax Office to claim partnership deductions or credits sufficient to eliminate or substantially reduce partners' tax liabilities.  Subsequently, the partnership returns were prepared to reflect the amounts reported on the partners' individual income tax returns.  The promotional materials explained that, beginning in 1982, other members of the Hoyt Tax Office would sign the individual partners' tax returns as preparers instead of Hoyt.  The materials further stated that the preparers would assist each partner in claiming all nonpartnership tax deductions and credits available to the partner before claiming any flowthrough deductions from the partnership.  If a partner needed more or less partnership loss in any year, the Hoyt Tax Office arranged the increase quickly without requiring the partner to pay a higher fee to an outside return preparer.  Hoyt routinely had the individual's Federal income tax returns prepared and filed claiming large partnership losses before the Form 1065, U.S. Partnership Return of Income, was prepared and filed.  Sometimes this would result in an inconsistency between the loss shown on an individual return and the amount shown on the partner's Schedule K-1, Partner's Share of Income, Credits, Deductions, Etc.

From 1981 through 1991, Hoyt formed eight of the nine sheep partnerships at issue pursuant to the laws of California.  RCR

85-2 was formed pursuant to the laws of Nevada.  From their inception, all nine sheep partnerships were operated from the Hoyt office in Elk Grove, California.  Several of the partnerships did not have signed partnership agreements or had no partnership agreements at all.

From the time each Hoyt sheep partnership was formed through 1998, Hoyt was the general partner responsible for all the management, operation, and promotion functions, and he made all major decisions.  He was also the TMP of each partnership.[7]

In the early 1980s, Hoyt had formed so many investor partnerships that the documents, records, and tax returns of the partnerships were inaccurate, unreliable, and in many instances falsified.  For the years at issue, often no records were kept.

As the general partner managing each sheep partnership, Hoyt was responsible for and directed the preparation of the tax returns of each partnership, and he typically signed and filed each tax return.  However, Hoyt did not maintain separate bank accounts or bookkeeping and accounting records for each of the sheep partnerships.  From 1981 until sometime in 1990, checks from the sheep partners were deposited in one checking account.

---

[7]By orders of the Tax Court issued from June 22, 2000, through May 15, 2001, Hoyt was removed as TMP from the sheep partnerships.  Hoyt was also a licensed enrolled agent who represented many of the investor-partners before the IRS.  In 1997, the IRS removed Hoyt as an enrolled agent for alleged improprieties relating to his individual income tax returns.

The account was in the name of River City Ranches. Sometime in 1990, Hoyt discontinued using that account. He implemented a new business practice of commingling all Hoyt organization funds in one checking account referred to as the pooling account. This account was in the name of W.J. Hoyt Sons Ranches MLP (MLP). The funds in the pooling account were then allocated to the various Hoyt entities on the basis of a percentage determined by Hoyt.

David Barnes (Barnes), a longtime sheep breeder and Hoyt's childhood friend, owned and operated a sheep breeding business called Barnes Ranches. From April 1981 through February 1987, Hoyt, representing the Hoyt sheep partnerships, entered into agreements with Barnes Ranches. Some of the sheep partnerships did not have all of the principal documents evidencing their purported sheep sale agreements with Barnes Ranches. Each partnership allegedly purchased breeding ewes from Barnes Ranches and concurrently entered into a 15-year management or sharecrop agreement with Barnes Ranches. The purported sheep breeding activities of the partnerships were not arm's-length transactions because Hoyt and the Barnes family were not independent parties acting at arm's length. Neither Barnes Ranches nor the partnerships adhered to the contractual terms of the agreements for the purported purchase of breeding ewes by the sheep partnerships. In actuality, the sheep partnerships acquired none of the benefits or burdens of ownership of any of the sheep.

Under the agreements, the partnerships were to purchase the sheep by issuing promissory notes to Barnes Ranches. The notes were then personally assumed by the partners of the partnership under an assumption agreement signed by Hoyt. The promissory notes that the sheep partnerships issued for the purchase of the sheep did not represent bona fide recourse debt. The security interests granted to Barnes Ranches by the partnerships to secure payment on the partnership promissory notes were not valid. Barnes Ranches never requested payment from the partnerships or the individual partners on the promissory notes, and the partnerships were not obligated to pay their promissory notes. The individual partners of the partnerships were not personally liable for the promissory notes to Barnes Ranches and never directly paid Barnes Ranches on the notes. The assumption agreements that Hoyt signed on behalf of individual partners with respect to the partnerships' promissory notes were not legally enforceable against the individual partners. Consequently, the promissory notes were not bona fide recourse debt, were not valid indebtedness, and were illusory, having no practical economic effect.

The purchase price of the flock purportedly sold to each partnership exceeded the value of each partnership's flock, and many of the sheep purportedly sold did not exist. The bills of sale that Barnes Ranches issued the sheep partnerships listed

large numbers of individual breeding sheep that did not exist. The flock recap sheets prepared by Hoyt contained false information and did not represent the sheep purportedly owned by each partnership. Sheep purportedly sold to the partnerships were not of the quality represented on the bills of sale. Further, the total purchase price that each partnership agreed to pay for each sheep was much greater than the fair market value of similar quality sheep. The average purported purchase price per ewe paid by the sheep partnerships ranged from $1,135 to $2,126, but these purchase prices were not within a reasonable range of value. The sheep that Barnes Ranches sold for $400 or more typically had been judged champions or had won some other awards at national shows, but the sheep purportedly sold to the sheep partnerships were nowhere near the quality of breeding sheep sold for $400 or more.

The partnerships never acquired control over the ewes allegedly purchased, nor did they obtain the benefits and burdens of ownership of any breeding ewe. Barnes Ranches purportedly managed the partnerships' breeding sheep in a commingled flock with Barnes's own sheep. No sheep registration certificates were issued in the name of any of the partnerships. Neither Hoyt nor Barnes Ranches kept any records that adequately identified the breeding sheep owned by each partnership. The partnerships could not identify the specific breeding sheep they purchased, nor

could they identify the specific breeding sheep they owned during the periods at issue. No sheep were transferred to the partnerships from Barnes Ranches.

Under the sharecrop operating agreements, Barnes Ranches was to manage and pay all expenses with respect to each partnership's breeding sheep. However, Barnes Ranches did not provide the partnerships with the management services required under the agreements. Barnes Ranches did not, as required under the sharecrop agreement, maintain adequate records allowing it to identify at all times the breeding sheep owned by each partnership. Barnes Ranches did not increase the number of breeding sheep owned by the partnerships by a net 5 percent per year as required by the sharecrop agreement. Barnes Ranches did not replace ewes purportedly owned by the partnerships that could no longer serve as breeding ewes with other ewes as required under the sharecrop agreement, nor did the partnerships receive any other benefit from the fertility warranty in the sharecrop agreement.

The sheep partnership transactions were shams and lacked economic substance. The partnerships themselves were shams and lacked economic substance. The partnerships had no business purpose beyond the generation of tax benefits.

B.   Partnership Returns

For the years at issue, the partnerships reported total deductions and credits attributable to nonexistent and overvalued sheep, interest deductions for illusory indebtedness, and false deductions for farm expenses and guaranteed payments as follows:

| Partnership | Year | Deductions | Docket No. |
|---|---|---|---|
| RCR #1 | 1986 | $87,123 | 787-91 |
| RCR #2 | 1986 | 203,544 | 787-91 |
|  | 1987 | 43,277 | 4876-94 |
| RCR #3 | 1986 | 207,064 | 787-91 |
|  | 1987 | 220,723 | 9550-94 |
|  | 1989 | 56,184 |  |
| RCR #4 | 1984 | 376,605 | 14038-96 |
|  | 1986 | 642,267 | 787-91 |
| RCR #5 | 1986 | 575,083 | 787-91 |
|  | 1987 | 833,605 | 9552-94 |
|  | 1988 | 516,657 | 13597-94 |
|  | 1989 | 958,120 |  |
| RCR #6 | 1986 | 560,341 | 787-91 |
| RCR 85-2 | 1987 | 888,875 | 9554-94 |
|  | 1988 | 404,680 | 13599-94 |
|  | 1989 | 1,363,974 | 13599-94 |

Hoyt signed, was responsible for, and directly participated in the preparation of each of the following sheep partnership tax returns (RCR tax returns):  RCR #2 for 1987; RCR #3 for 1987 and 1989; RCR #4 for 1984; RCR #5 for 1987, 1988 and 1989; and RCR 85-2 for 1987, 1988, and 1989.  The RCR tax returns identified

the principal business activity of the partnerships as "ranching" and the principal product of the partnerships as registered sheep. The RCR tax returns included false or fraudulent depreciation deductions and credits attributable to nonexistent and overvalued sheep, interest deductions for illusory indebtedness, and false deductions for farm expenses and guaranteed payments.

On Schedules F, Farm Income and Expenses, of the RCR tax returns, the partnerships reported the following false and fraudulent deductions pertaining to the purported ranching and registered sheep activities of the partnerships:

### RCR #2 Partnership

| Deductions | 1987 |
| --- | --- |
| Interest | $40,195 |
| Guaranteed payments | 3,082 |
| Total | 43,277 |

### RCR #3 Partnership

| Deductions | 1987 | 1989 |
| --- | --- | --- |
| Depreciation | $149,759 | $5,063 |
| Interest | 27,607 | 29,041 |
| Other farm deductions | 40,875 | 19,861 |
| Guaranteed payments | 2,482 | 2,219 |
| Total | 220,723 | 56,184 |

## RCR #4 Partnership

| Deductions | 1984 |
|---|---|
| Depreciation | $272,729 |
| Boarding fees | 103,876 |
| | 376,605 |

## RCR #5 Partnership

| Deductions | 1987 | 1988 | 1989 |
|---|---|---|---|
| Depreciation | $729,088 | $457,032 | $754,673 |
| Interest | 18,817 | 3,308 | 161,310 |
| Other farm deductions | 81,746 | 52,727 | 39,719 |
| Guaranteed payments | 3,954 | 3,590 | 2,418 |
| Total | 833,605 | 516,657 | 958,120 |

## RCR 85-2 Partnership

| Deductions | 1987 | 1988 | 1989 |
|---|---|---|---|
| Depreciation | $796,472 | $346,875 | $1,135,605 |
| Interest | 10,657 | 2,605 | 188,252 |
| Mortgage interest[1] | -0- | 2,068 | -0- |
| Other farm deductions | 81,746 | 52,572 | 39,719 |
| Guaranteed payments | -0- | 560 | 398 |
| | 888,875 | 404,680 | 1,363,974 |

[1]On the 1989 return, mortgage interest was included in the other farm deductions amount.

C.   Examination of Returns

Since approximately 1980, the IRS had regularly examined many of the partnership returns of the Hoyt cattle partnerships and the individual returns of their partners.  The IRS also examined the sheep partnerships' returns and the individual returns of their partners.  Because Hoyt did not maintain

separate bank accounts and accurate accounting records for each of the sheep partnerships, the IRS audited the partnership tax returns as a group. The IRS generally disallowed the partnership tax benefits that each cattle and sheep partnership and their respective partners claimed, resulting in those partnerships' and partners' commencing numerous cases in this Court.

After the initial IRS examinations of the many cattle and sheep partnerships, several investigations by various Government agencies were commenced relating to Hoyt's activities.

From 1984 through 1986, the IRS's Criminal Investigation Division (CID) conducted an investigation of Hoyt for allegedly backdating documents to enable 12 investor-partners to claim improper deductions and credits for 1980, 1981, and 1982. On July 31, 1986, the IRS District Counsel's Office in Sacramento, California, referred the matter to the Department of Justice (DOJ) for prosecution. The DOJ then forwarded the matter to the U.S. Attorney's Office in Sacramento for review and consideration. On August 12, 1987, the U.S. Attorney's Office declined to prosecute Hoyt.

In July 1989, a member of the IRS Examination Division team (which had been examining the returns of many of the cattle and sheep partnerships for the 1983 through 1986 taxable years) recommended that the IRS's CID investigate Hoyt for allegedly making and/or assisting in fraudulent or false tax return

statements in connection with his promotion and operation of the cattle partnerships.  In his referral report to the CID, this team member concluded that Hoyt was selling to some partnerships cattle that had already been sold to other partnerships and that he was depreciating cattle that did not exist.  The CID then conducted an investigation of the alleged nonexistent cattle and Hoyt's represented value for them.[8]  The CID conducted two other investigations of Hoyt but did not recommend that Hoyt be prosecuted.

With many cows and sheep spread over many facilities, the IRS had difficulty proving that the partnerships were shams.  On October 19, 1989, the IRS suffered a major setback when this Court filed its opinion Bales v. Commissioner, T.C. Memo. 1989-568, wherein this Court found that the Bales partnerships had acquired the benefits and burdens of ownership with respect to specific breeding cattle, that the purchase prices for the partnership cattle did not exceed their fair market value, and that the promissory notes the partnerships issued were valid recourse indebtedness.

_____

[8]On Oct. 13, 1989, during the CID's above-mentioned investigation, the U.S. Attorney's Office in Sacramento requested that the CID review certain information and determine whether IRS special agents from the CID should join in an ongoing grand jury investigation of Hoyt for possible violations of the internal revenue laws.  On Nov. 3, 1989, the IRS Regional Counsel's Office requested that IRS special agents be authorized to participate in the grand jury investigation.  On Oct. 2, 1990, the U.S. Attorney's Office ended the grand jury investigation of Hoyt without an indictment.

On May 14, 1990, respondent assessed penalties of $90,000 under section 6701 against Hoyt. Hoyt filed a refund claim in July 1990. In November 1990, respondent's counsel advised the IRS that, in the light of the Bales opinion, it was unlikely that imposition of the penalties ultimately would be sustained. The IRS abated the $90,000 of section 6701 penalties in early 1991.

In October 1990, the IRS issued Hoyt a summons for the sheep partnerships' 1987 tax year. At the time, respondent was also seeking documents to prepare for trials pending in this Court regarding cattle partnerships' 1980-86 taxable years. Hoyt informed respondent that he was unable to simultaneously produce documents for the docketed cattle cases and the sheep partnerships' 1987-90 taxable years.

Hoyt and the IRS executed Forms 872-P, Consent to Extend the Time to Assess Tax Attributable to Items of a Partnership, extending the period of limitations on assessments for certain taxable years of RCR #2, RCR #3, RCR #4, RCR #5, and RCR 85-2. Hoyt executed each of the extension agreements as TMP for the various sheep partnerships. The partnership taxable year involved, the date upon which the partnership return was deemed filed, the date the original 3-year period for assessing a deficiency would expire, the IRS extension form used, the date upon which the IRS executed the form, and the date to which Hoyt and the IRS (in the form) agreed to extend the period of limitations were as follows:

| Partnership | Taxable Year Ended | Date Return Filed | 3-Year Expiration Date | Form | Date Executed Hoyt | IRS | Expiration Date |
|---|---|---|---|---|---|---|---|
| RCR #2 | 12/31/1987 | 5/19/1988 | 5/19/1991 | 872-P | 2/15/1991 | 2/27/1991 | 12/31/1992 |
| | | | | 872-P | 7/25/1992 | 8/26/1992 | 6/30/1993 |
| | | | | 872-P | 3/6/1993 | 3/29/1993 | 12/31/1993 |
| RCR #3 | 12/31/1987 | 10/20/1988 | 10/20/1991 | 872-P | 2/15/1991 | 2/22/1991 | 12/31/1992 |
| | | | | 872-P | 7/25/1992 | 8/26/1992 | 6/30/1993 |
| | | | | 872-P | 3/6/1993 | 3/30/1993 | 12/31/1993 |
| | 9/30/1989 | 4/15/1990 | 4/15/1993 | 872-P | 7/25/1992 | 8/26/1992 | 6/30/1993 |
| | | | | 872-P | 3/6/1993 | 3/30/1993 | 12/31/1993 |
| RCR #4 | 12/31/1984 | 10/18/1985 | 10/18/1988 | 872-P | 8/1/1987 | 8/1/1987 | Indefinite |
| RCR #5 | 12/31/1987 | 10/21/1988 | 10/21/1991 | 872-P | 2/15/1991 | 2/22/1991 | 12/31/1992 |
| | | | | 872-P | 7/25/1992 | 8/26/1992 | 6/30/1993 |
| | | | | 872-P | 3/6/1993 | 3/30/1993 | 12/31/1993 |
| | 12/31/1988 | 10/17/1989 | 10/17/1992 | 872-P | 2/15/1991 | 2/22/1991 | 12/31/1992 |
| | | | | 872-P | 7/25/1992 | 8/26/1992 | 6/30/1993 |
| | | | | 872-P | 3/6/1993 | 3/30/1993 | 12/31/1993 |
| | 9/30/1989 | 4/15/1990 | 4/15/1993 | 872-P | 7/25/1992 | 8/26/1992 | 6/30/1993 |
| | | | | 872-P | 3/6/1993 | 3/30/1993 | 12/31/1993 |
| RCR 85-2 | 12/31/1987 | 10/20/1988 | 10/20/1991 | 872-P | 2/15/1991 | 2/22/1991 | 12/31/1992 |
| | | | | 872-P | 7/25/1992 | 8/26/1992 | 6/30/1993 |
| | | | | 872-P | 3/6/1993 | 3/30/1993 | 12/31/1993 |
| | 12/31/1988 | 10/17/1989 | 10/17/1992 | 872-P | 2/15/1991 | 2/22/1991 | 12/31/1992 |
| | | | | 872-P | 7/25/1992 | 8/26/1992 | 6/30/1993 |
| | | | | 872-P | 3/6/1993 | 3/30/1993 | 12/31/1993 |
| | 9/30/1989 | 4/15/1990 | 4/15/1993 | 872-P | 7/25/1992 | 8/26/1992 | 6/30/1993 |
| | | | | 872-P | 3/6/1993 | 3/30/1993 | 12/31/1993 |

On December 12, 1991, the IRS met with Hoyt and requested extensions of the limitations periods for the 1987 and 1988 tax years for the partnerships. In a letter also dated December 12, 1991, the IRS informed Hoyt that it was considering imposing return preparer penalties. On December 13, 1991, Hoyt faxed a letter to the IRS stating that he would agree to sign the extensions if, and only if, the IRS would agree to extend the period for assessing any penalties against Hoyt and the other return preparers. In a letter dated December 18, 1991, the IRS informed Hoyt that it would not agree to postpone preparer penalty considerations in exchange for extensions for the partnerships.

On May 21, 1992, the IRS sent a letter to Hoyt reconfirming its understanding that Hoyt would not consent to extend the assessment periods for the various partnerships unless "some way can be found to extend the assessment period for preparer penalties currently proposed."

In June 1992, the IRS and Hoyt reached an agreement whereby Hoyt consented to extend the limitations periods for the tax years 1987 though 1989, and the IRS agreed to delay assessing any preparer penalties for those same years until an FPAA was issued.

After the Bales setback, the IRS decided to conduct a full headcount of the Hoyt livestock to prove that Hoyt was selling cattle and sheep to some partnerships that had already been sold

to other partnerships and that he was depreciating livestock that did not exist.  By February 1993, although the IRS's inspection and livestock count were not fully completed,[9] IRS personnel concluded that Hoyt had greatly overstated the number of breeding animals that these partnerships claimed to own and had grossly overvalued the livestock upon which the partnerships were claiming tax benefits.  As a result of the count and inspection, the IRS believed by February 1993 that it possessed sufficient evidence to support the issuance of prefiling notices and freezing tax refunds claimed by the partners.

On the basis of the above conclusions from its count of the cattle and sheep, the IRS, beginning in February 1993, generally froze and stopped issuing income tax refunds to partners in the cattle and sheep partnerships.[10]  The IRS issued prefiling notices to the investor-partners advising them that, starting with the 1992 taxable year, the IRS would:  (1) Disallow the tax

---

[9]The IRS retained cattle expert Ron Daily to conduct a physical count of all cattle held by the Hoyts as of yearend 1992.  The count was conducted with Hoyt personnel from October 1992 through April 1993.  Martinez v. United States, 341 Bankr. 568, 571 (Bankr. E.D. La. 2006).

[10]Following the IRS's freezing in February 1993 of tax refunds to partners in the cattle and sheep partnerships, the Hoyt organization experienced financial difficulties.  Freezing the tax refunds greatly diminished the amount of money the Hoyt organization obtained from new and existing partners.  An increasing number of investor-partners became disgruntled with Hoyt and the Hoyt organization.  Many partners stopped making their partnership payments and withdrew from their partnerships.

benefits that the partners claimed on their individual returns from the cattle and sheep partnerships; and (2) not issue any tax refunds these partners might claim attributable to such partnership tax benefits.

Following respondent's issuance of prefiling notices to the partners in February 1993 and the completion of the count and inspection of the livestock in May or June 1993, the Examination Division on or about December 30, 1993, issued letters to all the partners in which it warned them that IRS personnel had concluded and determined that: (1) A number of fictitious breeding cattle and sheep had been sold to the Hoyt cattle and sheep partnerships; and (2) Hoyt and the Hoyt organization had overstated both the numbers and value of the purported livestock that the partnerships allegedly owned.

Respondent eventually issued: (1) Notices of deficiency to numerous investor-partners for the 1980, 1981, and 1982 tax years, in which respondent determined that none of the tax benefits the partners claimed from the cattle and sheep partnerships were allowable; and (2) FPAAs to many of the cattle and sheep partnerships for the taxable years 1983, 1984, 1985, and 1986, in which respondent disallowed the tax benefits these partnerships claimed. On December 20, 1993, respondent issued FPAAs to RCR #2 for its tax year ending December 31, 1987, to RCR #3 for its tax years ending December 31, 1987, and September 30,

1989, and to RCR #5 and RCR 85-2 for their tax years ending December 31, 1987 and 1988, and September 30, 1989. On March 24, 1996, respondent issued an FPAA to RCR #4 for its tax year ending December 31, 1984.

D. Hoyt's Criminal Conviction

From 1993 through 1998, governmental agencies other than the IRS, including the Securities and Exchange Commission (SEC), the U.S. Postal Service (USPS), and the U.S. Trustee, also investigated Hoyt. As a result of a referral for further investigation from the U.S. Attorney's Office in Seattle, Washington, to the USPS, postal inspectors in late 1993 began an investigation of Hoyt and the Hoyt organization for possible mail fraud violations.

During 1993 and 1994, the SEC conducted an ongoing investigation of Hoyt, but the SEC eventually closed its investigation and deferred to the USPS's investigation of Hoyt that had been commenced in late 1993. In June 1995, postal inspectors seized numerous documents and records from the offices of the Hoyt organization pursuant to a search warrant.

On or about June 8, 1995, in the 32d Judicial District Court for the Parish of Terrebonne, State of Louisiana, a group of investors obtained an $11 million default judgment against Hoyt, Management, MLP, and several cattle breeding partnerships for fraud and other violations. See Mabile v. Hoyt, No. 95-112222.

On November 24, 1998, the Government filed an indictment in the U.S. District Court for the District of Oregon against Hoyt and several other persons who had worked for or engaged in transactions with the Hoyt organization, including Barnes and his wife, charging them with numerous counts of conspiracy and mail fraud.  Shortly thereafter, respondent moved this Court to remove Hoyt as TMP in many of the cattle and sheep partnership cases pending before it.[11]  In orders issued from June 22, 2000, through May 15, 2001, this Court removed Hoyt as TMP in numerous cattle and sheep partnership cases, pursuant to Rule 250(b).

On February 12, 2001, Hoyt was convicted of 1 count of conspiracy to commit fraud, 31 counts of mail fraud, 3 counts of bankruptcy fraud, and 17 counts of money laundering.  See United States v. Barnes, No. CR 98-529-JO-04 (D. Or. Feb. 12, 2001), affd. sub nom. United States v. Hoyt, 47 Fed. Appx. 834 (9th Cir. 2002).  The U.S. District Court sentenced Hoyt to 235 months of imprisonment and ordered him to pay restitution of over $102 million to the individual victims of his crimes.  This $102 million figure represented the total amount that the Government (using Hoyt organization records) determined was paid to the Hoyt organization from 1982 through 1998 by investor-partners in the

---

[11]On June 2, 1999, the Government filed a superseding indictment against the same defendants, which, among other things, charged Hoyt with 54 counts of conspiracy to commit fraud, mail fraud, bankruptcy fraud, and money laundering.

cattle partnerships, the sheep partnerships, and other similar partnerships that Hoyt promoted. The fraud perpetrated by Hoyt "impacted over 4,000 people and had actual and intended losses exceeding $200 million." United States v. Hoyt, supra at 837.

OPINION

Issue 1. Whether Partnership Transactions and the Sheep Partnerships Lacked Economic Substance and Were Shams, and Whether There Were Partnership Asset Overvaluations and Basis Overvaluations

The Court of Appeals reversed our holding in River City Ranches I that we lacked jurisdiction to make factual findings as to whether the partnerships' transactions were tax-motivated for purposes of imposing section 6621(c) penalty-interest against investor-partners. Thus, the Court of Appeals remanded for us to make such findings. We have done so in our supplemental factual findings set forth herein.

We point out that many of the key facts have been stipulated by the parties and are so found. Furthermore, our prior opinion in River City Ranches #4, J.V. v. Commissioner, T.C. Memo. 1999-209, supports the conclusion that the activities of these partnerships lacked economic substance and were shams for each of the years of their existence. The findings in that case are equally applicable to these cases because the facts and evidence with respect to these partnerships' breeding activities are the same as the facts and evidence considered there. While the proceeding in River City Ranches #4, J.V. involved only three of

the sheep breeding partnerships, the Court considered evidence pertaining to all of the sheep partnerships. And all the sheep breeding partnerships were operated in the same manner.

Section 6621(c) provides for an increased rate of interest with respect to any substantial underpayment of tax in any taxable year attributable to a tax-motivated transaction. Section 6621(c)(3)(A) generally lists the types of transactions which are considered "tax-motivated transactions". A tax-motivated transaction includes any valuation overstatement within the meaning of section 6659(c), and such a valuation overstatement exists, among other situations, if the adjusted basis of property claimed on any return exceeds 150 percent of the correct amount of basis. Secs. 6621(c)(3)(A)(i), 6659(c). A tax-motivated transaction further includes "any sham or fraudulent transaction." Sec. 6621(c)(3)(A)(v).

It is well established that the tax consequences of transactions are governed by substance rather than form. Frank Lyon Co. v. United States, 435 U.S. 561, 573 (1978). When taxpayers resort to the expedient of drafting documents to characterize transactions in a manner which is contrary to objective economic realities and which has no significance beyond expected tax benefits, the particular forms they employ are disregarded for tax purposes. Id. at 572-573; Helvering v. F. & R. Lazarus & Co., 308 U.S. 252, 255 (1939). If a transaction is

devoid of economic substance, it is not recognized for Federal taxation purposes. Gregory v. Helvering, 293 U.S. 465 (1935).

Determining the economic substance of a transaction requires an analysis of several objective factors: (1) Whether the stated price for the property was within reasonable range of its value; (2) whether there was any intent that the purchase price would be paid; (3) the extent of the taxpayer's control over the property; (4) whether the taxpayer would receive any benefit from the disposition of the property; (5) whether the benefits and burdens of ownership passed; (6) the presence or absence of arm's-length negotiations; (7) the structure of the financing; (8) the degree of adherence to contractual terms; and (9) the reasonableness of the income and residual value projections. Levy v. Commissioner, 91 T.C. 838, 854 (1988); Rose v. Commissioner, 88 T.C. 386, 410 (1987), affd. 868 F.2d 851 (6th Cir. 1989).

Our findings reflect the consideration of these objective factors. The partnerships had no business purpose beyond generating tax benefits. The facts show that the partnerships themselves were shams and lacked economic substance. They were merely a facade used by Hoyt to provide the tax benefits he promised in his promotional materials. They had no independent economic substance beyond the purported sheep breeding transactions which were also illusory and had no economic effect.

The only purported business purpose of these partnerships was their sheep breeding activities. Yet, as we have found, the partnerships never acquired the benefits and burdens of ownership, the promissory notes did not evidence valid indebtedness, and Barnes Ranches never performed under the sharecrop agreement. Consequently, they could not, and did not, conduct any economic activities.

There are a number of other facts supporting our conclusion that the partnerships lacked economic substance and were shams. For example, there were many irregularities in the partnerships' documents. Several of the partnerships did not have signed partnership agreements or had no partnership agreements at all. There was no separate prospectus for each of the sheep partnerships; instead Hoyt used the promotional materials he had prepared for the cattle partnerships. And not all of the sheep partnerships had all of the principal documents to evidence their purported sheep sale agreements with Barnes Ranches.

The traditional books and records expected of a partnership that has economic substance were lacking. The sheep partnerships did not maintain separate books, records, or assets. None of them had separate bank accounts.

We are persuaded that all of the above facts support our conclusion that the partnerships and their purported sheep

breeding activities lacked economic substance, were shams, and existed only to provide tax benefits.

It is also significant in these cases that for section 6621(c) penalty-interest purposes the partnerships overvalued their assets and overstated their bases therein. The parties have stipulated facts that support findings of partnership asset overvaluations and basis overstatements. For example, they stipulated that: (1) The purchase prices exceeded the value of each partnership's flock because many of the sheep purportedly sold did not exist; (2) sheep sold to the partnerships for average prices ranging from $1,135 to $2,126 were nowhere near the quality of breeding sheep Barnes Ranches sold for $400 or more; (3) the partnerships never acquired the benefits and burdens of ownership; and (4) the promissory notes used to purchase the sheep did not represent valid indebtedness. Because we have determined that the partnership transactions lacked economic substance and are shams and that the partnerships never acquired the benefits and burdens of ownership, it follows that the adjusted bases in the sheep are zero. Clayden v. Commissioner, 90 T.C. 656, 677-678 (1988); Rose v. Commissioner, supra at 426; Zirker v. Commissioner, 87 T.C. 970, 978-979 (1986).

We conclude that the partnerships' activities are tax-motivated transactions within the meaning of section 6621(c).

Issue 2.  <u>Whether the Period of Limitations on Assessment Had
          Expired When the FPAAs Were Issued</u>

The period for making assessments of tax attributable to a

partnership item or affected item is set forth in section 6229.

Section 6229 provides in pertinent part:

> SEC. 6229.   PERIOD OF LIMITATIONS FOR MAKING
>              ASSESSMENTS.
>
>     (a) General Rule.--Except as otherwise provided in
> this section, the period for assessing any tax imposed
> by subtitle A with respect to any person which is
> attributable to any partnership item (or affected item)
> for a partnership taxable year shall not expire before
> the date which is 3 years after the later of--
>
>         (1) the date on which the partnership return
>     for such taxable year was filed, or
>
>         (2) the last day for filing such return for
>     such year (determined without regard to
>     extensions).
>
>     (b) Extension by Agreement.--
>
>     (1) In general.--The period described in
> subsection (a) (including an extension period
> under this subsection) may be extended--
>
> *       *       *       *       *       *       *
>
>         (B) with respect to all partners, by an
>     agreement entered into by the Secretary and
>     the tax matters partner (or any other person
>     authorized by the partnership in writing to
>     enter into such an agreement),
>
>     before the expiration of such period.
>
> *       *       *       *       *       *       *

(c) Special Rule in Case of Fraud, Etc.--

(1) False return.--If any partner has, with the intent to evade tax, signed or participated directly or indirectly in the preparation of a partnership return which includes a false or fraudulent item--

(A) in the case of partners so signing or participating in the preparation of the return, any tax imposed by subtitle A which is attributable to any partnership item (or affected item) for the partnership taxable year to which the return relates may be assessed at any time, and

(B) in the case of all other partners, subsection (a) shall be applied with respect to such return by substituting "6 years" for "3 years."

Respondent issued the FPAAs at issue after the normal 3-year periods for assessment had expired. With regard to these FPAAs, however, Hoyt, as TMP, had executed consents extending the limitations periods. The partnerships argue that the extensions are invalid because Hoyt executed them while disabled by conflicts between his own interests and those of his partners. Respondent argues that the consents were valid and, alternatively, if the waivers are invalid, the 6-year limitations period under section 6229(c)(1) applies.

In River City Ranches I, we found that the partnerships did not present evidence sufficient to show that Hoyt executed the consents under disabling conflicts of interest. We concluded, therefore, that the FPAAs were timely issued.

In River City Ranches II, the Court of Appeals held that the partnerships were entitled to discovery of respondent's central Hoyt files to find out the facts concerning Hoyt's interests in his dealings with respondent and what respondent knew about Hoyt's interests and his treatment of the partners' interests. River City Ranches #1 Ltd. v. Commissioner, 401 F.3d at 1141, 1143.

Pursuant to the mandate of the Court of Appeals, we granted petitioners' motions to take the depositions of Jill Page, Sue Hullen, and Norman Johnson, present or former IRS employees whom petitioners had called as witnesses during the 2001 trial of these cases. Petitioners took their depositions in April 2006. In order to make further information available to petitioners, respondent went beyond the Court of Appeals' direction regarding limited additional discovery and made available to petitioners his entire store of documents that had not been produced earlier. This consisted of approximately 160 boxes of documents and 700 linear feet of IRS central Hoyt files.

After the discovery sought by petitioners was completed, the Court held a second trial on September 11 and 12, 2006.

A.    Waivers Executed by Hoyt in March 1993 Are Invalid

In River City Ranches I, we analogized these cases to Phillips v. Commissioner, 272 F.3d 1172 (9th Cir. 2001), affg. 114 T.C. 115 (2000), in which the Court of Appeals held that the

mere existence of past criminal investigations of a TMP does not prove a disabling conflict of interest. We found that, as in Phillips, Hoyt was not under active criminal investigation by the IRS when he signed any of the extensions.

In River City Ranches #1 Ltd. v. Commissioner, 401 F.3d at 1142, the Court of Appeals limited the application of Phillips, stating:

> The comparison to Phillips is unilluminating, however, because in Phillips "[t]he facts were stipulated by the parties in skeletal form sufficient to provide, without much flesh, what was necessary to raise the single issue relied on by Phillips." Id. at 1173. The lesson of Phillips is that the sole fact of past criminal investigations does not establish a disabling conflict of interest. But there is more to the partnerships' assertion of a disabling conflict than past criminal investigations, and the record before us in this case is not a bare skeleton.

Respondent suspected that Hoyt was selling cattle to some partnerships that had already been sold to other partnerships and that he was depreciating cattle that did not exist. Although Hoyt was not under active criminal investigation by the IRS when he signed any of the consents, at various times from 1984 through 1990 Hoyt was investigated by the CID, the DOJ, and the U.S. Attorney's Office.

Hoyt signed the consents between February 1991 and March 1993, during the period when respondent was first seeking and then performing the headcount that would prove Hoyt's crimes. Hoyt's unwillingness in late 1991 and early 1992 to consent to

extensions of the limitations period for the partnerships unless the IRS delayed assessing the preparer penalty until the FPAAs were issued also indicated that Hoyt was allowing his personal interests to interfere with his fiduciary duty to the partnerships.

As early as mid-1989, the IRS suspected that Hoyt had not purchased the sheep reportedly owned by the partnerships, in breach of his fiduciary duty to the partnerships. By February 1993, the ongoing inspection and livestock count confirmed respondent's suspicion that Hoyt had greatly overstated the number of breeding animals the partnerships claimed to own and had grossly overvalued the livestock upon which the partnerships were claiming tax benefits. By February 1993, as a result of the count and inspection, respondent possessed sufficient evidence to support the issuance of prefiling notices and freezing tax refunds claimed by partners. Beginning in February 1993, respondent generally froze and stopped issuing income tax refunds to partners in the cattle and sheep partnerships and issued prefiling notices to the investor-partners advising them that, starting with the 1992 taxable year, the IRS would: (1) Disallow the tax benefits that the partners claimed on their individual returns from the cattle and sheep partnerships; and (2) not issue any tax refunds these partners might claim attributable to such partnership tax benefits. Respondent did not directly inform the

investor-partners that Hoyt had greatly overstated the number of breeding animals the partnerships claimed to own and had grossly overvalued the livestock upon which the partnerships were claiming tax benefits until the Examination Division issued warning letters to all the partners on December 30, 1993 (shortly after the FPAAs were issued).

"Trust law, generally, invalidates the transaction of a trustee who is breaching his trust in a transaction in which the other party is aware of the breach." Phillips v. Commissioner, supra at 1175. By February 1993, respondent knew that "Hoyt had been taking money for non-existent cows and sheep--for which Hoyt presumably knew he was vulnerable to criminal prosecution." River City Ranches #1 Ltd. v. Commissioner, 401 F.3d at 1142.

It was in the partners' interest for the FPAAs to be issued sooner rather than later because the FPAAs provided the partners a strong indication that Hoyt was looting the partnerships and that the partners had in fact claimed tax benefits to which they were not entitled. Delay would perpetuate Hoyt's concealment of his theft and result in greater penalties and interest when the taxes were collected.

By contrast, extending the limitations periods within which respondent could issue the FPAAs was in Hoyt's interest because it delayed discovery of his theft. Hoyt's interests ran toward delaying as long as possible any threat to the house of cards he

had constructed "in the hope that it would put off the day of reckoning--perhaps forever, if his long run of luck held out." Id. at 1143.

We find that by February 1993, respondent knew or had reason to know that Hoyt's interest in extending the period within which respondent could issue the FPAAs was in conflict with the investor-partners' interest in not delaying the issuance of the FPAAs. Thus we conclude that the consents to extend the limitations period signed in March 1993 are invalid.[12] Hoyt signed the consent to extend indefinitely the assessment period for RCR #4's 1984 tax year on August 1, 1987, before respondent knew or had reason to know that Hoyt's interest in extending the limitations period conflicted with the partners' interests. The consent is valid, and respondent timely issued an FPAA to RCR #4 for its 1984 tax year on March 24, 1996.

B. The 6-Year Limitations Period Under Section 6229(c)(1) Applies to the Sheep Partnership Returns for the Years at Issue

Notwithstanding our conclusion that the consents to extensions of the limitations periods executed by Hoyt, the TMP,

---

[12]On Apr. 13, 2007, the U.S. Bankruptcy Court for the Eastern District of Louisiana held that the consents to extend the limitations period signed with respect to Hoyt cattle partnerships were invalid for similar reasons. In re Martinez, ___ Bankr. ___, 99 AFTR 2d 2007-2375 (Bankr. E.D. La. 2007). Apparently, the Government did not raise the application of the 6-year limitations period under sec. 6229(c)1)(B), and the Bankruptcy Court held that the FPAAs were untimely.

on March 6, 1993, and by the IRS on March 30, 1993, were invalid because of Hoyt's disabling conflicts of interests, we must still decide the alternative issue asserted by respondent as to whether the 6-year period for assessment provided in section 6229(c)(1)(B) applies because of fraud.

Petitioners contend that respondent failed to prove that Hoyt had a specific intent to evade tax and that each sheep partnership return included false or fraudulent items. They assert that respondent cannot rely solely on petitioners' admissions that there were false items on the partnership returns. To the contrary, respondent contends that he has clearly and convincingly carried his burden of proof and met all of the necessary requirements of section 6229(c)(1)(A) and (B). We agree with respondent.

The 6-year limitations period applies if four requirements are met: (1) The entity is a partnership; (2) the partnership return includes a false or fraudulent item; (3) a partner signed or participated directly or indirectly in the preparation of the return; and (4) the partner signed or participated with the intent to evade tax. Sec. 6229(c)(1); Transpac Drilling Venture, 1983-2 v. United States, 83 F.3d 1410, 1414 (Fed. Cir. 1996), affg. 32 Fed. Cl. 810 (1995); cf. Allen v. Commissioner, 128 T.C. 37 (2007). There is no requirement that the signer of the partnership return intend to evade his own taxes. The 6-year

statute is applicable to each partner if, in signing a false or fraudulent partnership return, the signer intended to evade the taxes of the other partners. Transpac Drilling Venture, 1983-2 v. United States, supra at 1414-1415. There is also no requirement that the other partners have knowledge of the false or fraudulent deductions claimed on a partnership return. The intent of the signer of the partnership return to evade the taxes of the other partners satisfies the intent element of the 6-year statute of limitations for making additional assessments under section 6229(c)(1), which applies when the partnership return containing false or fraudulent items is signed with intent to evade tax. Id. It is the fraudulent nature of the return that extends the limitations period. Allen v. Commissioner, supra at 42.

In these cases there is no dispute that the first three requirements are satisfied. Petitioners have not contested them. Indeed, they have acknowledged by their stipulated admissions that all the sheep partnership returns contained false and fraudulent deductions, and the facts support those findings. Likewise, the fact that Hoyt, as TMP, participated in the preparation of the partnership returns and signed them with the intent to evade the taxes of the partners is established by petitioners' admissions on the workings of Hoyt's tax shelter scheme, the sham nature of the transactions and their lack of

economic substance, and the methods used in preparing the individual and partnership returns.  See Transpac Drilling Venture, 1983-2 v. United States, 32 Fed. Cl. at 821 (where the Court of Federal Claims looked at the sham nature of the transaction in its analysis of the 6-year fraud statute set forth in section 6229(c)(1)).

During the years at issue, Hoyt's scheme was to sell tax deductions using phoney partnerships that generated false and fraudulent flowthrough tax deductions.  As reflected in our factual findings, the sheep partnership returns filed for the periods 1984, 1987, 1988, and 1989 included the following false or fraudulent items:  (1) Depreciation deductions and credits attributable to nonexistent and overvalued sheep, (2) interest deductions for illusory indebtedness relating to nonexistent and overvalued sheep, and (3) false deductions for farm expenses and guaranteed payments.

Petitioners not only admitted in their pleadings that the returns signed by Hoyt included false information, but they also repeatedly referred to Hoyt's fraudulent conduct and deception in their other submissions to the Court.

We have examined the structure and workings of Hoyt's cattle and sheep partnerships in River City Ranches I, Durham Farms #1 v. Commissioner, T.C. Memo. 2000-159, affd. 59 Fed. Appx. 952 (9th Cir. 2003), and River City Ranches #4, J.V. v. Commissioner,

T.C. Memo. 1999-209.  River City Ranches #4, J.V. and Durham Farms #1 were test cases for Hoyt cattle and sheep partnerships tried and decided by this Court during 1996 and 1997.  In 2001, we heard the remaining sheep partnership cases that resulted in our opinion in River City Ranches I, some of which are presently before us on this remand from the Court of Appeals.

Basically, our findings in River City Ranches I mirror our findings in the sheep partnership test cases in River City Ranches #4, J.V., which explain how Hoyt's scheme worked and show that the partnership returns contained false and fraudulent deductions and were prepared by Hoyt with the intent to evade the tax liability of the partners.  They are incorporated by reference in our fact findings here.

There are several indicia of Hoyt's fraudulent intent to evade tax when, as a partner and TMP, he participated in the preparation of the partnership returns and signed them.

The RCR returns reported depreciation of breeding flocks calculated on cost bases that Hoyt knew were based on false and fraudulent flock recap sheets that listed nonexistent sheep, on purported purchase prices that were much greater than the fair market value of similar quality sheep, and on promissory notes that did not create bona fide indebtedness.  Moreover, the entire transaction was without substance, and the partnerships did not acquire the benefits and burdens of ownership of the sheep.

Similarly, Hoyt knew that other farm deductions claimed on the partnership returns for such items as feed, freight, gasoline, insurance, rent of farm pasture, repairs, supplies, utilities, veterinary fees, contract labor, and advertising expenses were false and fraudulent because the partnership did not have the livestock to require these expenses.

The interest deductions claimed on the partnership returns were purportedly claimed with respect to the promissory note each partnership issued in connection with the purported acquisition of its breeding sheep. The interest deductions claimed on the promissory notes were false and fraudulent because the promissory notes the sheep partnerships issued for their breeding flocks were not bona fide recourse debt. The notes had no economic effect to the partnerships and were not valid indebtedness. Finally, as this Court previously found in River City Ranches #4, J.V. v. Commissioner, supra, the actions of the Barnes family and Hoyt evidence that they themselves viewed the partnership notes as essentially illusory and having no practical economic effect and that the notes were merely a facade to support the tax benefits that Hoyt had promised investors in the partnerships.

The guaranteed payments claimed on the partnership returns purportedly pertain to payments made by the partnerships to Hoyt as "sheep sales incentive". However, since the partnerships never acquired the benefits and burdens of its principal product,

i.e., registered sheep, it follows that the deductions claimed for guaranteed payments were false and fraudulent.

When the partnership returns were filed claiming the false and fraudulent deductions, Hoyt was an enrolled agent before the IRS. He was a sophisticated person preparing the partnership returns who had demonstrated by obtaining his enrolled agent status that he was aware of the return filing requirements and the necessity of maintaining proper books and records.

Through participation in the Hoyt partnerships, the partners received the benefits of the false and fraudulent partnership deductions. A partnership is required to file an annual information tax return even though it is not a taxable entity for Federal income tax purposes. Secs. 701, 6031; sec. 1.701-1, Income Tax Regs. Each partner is liable for income tax in his or her individual capacity with respect to his or her share of partnership items of income, loss, deduction, and credit. Sec. 701; sec. 1.702-1, Income Tax Regs. Thus, through such participation in the Hoyt partnerships, each partner received flowthrough partnership deductions that were false and fraudulent and which reduced or eliminated the partner's tax liability.

The falsity of the partnership deductions and Hoyt's intent to evade tax is further supported by the manner in which the partners "purchased" their partnership interests and the focus of the promotional materials. The partnership interest and the

resulting flowthrough partnership deductions were "purchased" with 75 percent of the partner's tax savings resulting from the flowthrough partnership deductions. The 75-percent tax savings were determined first by computing the partner's tax liability without participation in a Hoyt partnership and then computing the partner's tax savings using the Hoyt partnership loss. The difference in the two calculations was the partner's tax savings, of which 75 percent was paid to the Hoyt organization and 25 percent was to be retained by the partner. In addition, in the initial year of investment, amended returns claiming refunds were often filed for the partner's prior 3 taxable years. The Hoyt organization received 75 percent of such refunds, and the partners retained 25 percent. Each year the partner's payment to the Hoyt organization was adjusted to reflect the 75/25 split. Because the investment was based on "tax savings" and not on original cash outlay, Hoyt's partnership scheme essentially paid for itself.

It is clear that the sheep partnerships were merely a facade Hoyt used to provide the fraudulent tax benefits he promised to the partnerships' investors. Hoyt's promotional materials so indicate. Hoyt did not have a separate prospectus for each of the sheep partnerships. Instead, he used the same promotional materials he had prepared for the cattle partnerships. And the promotional materials used to market the investments focused

heavily on the investors' tax savings. One brochure, titled "The 1,000 lb Tax Shelter", highlighted the investors' writeoffs, refers to the investment as a tax shelter, and emphasizes that the primary return on an investment in a Hoyt partnership would be from the tax savings. See Van Scoten v. Commissioner, T.C. Memo. 2004-275 (where the Tax Court made a similar finding based on its review of the same Hoyt brochure), affd. 439 F.3d 1243 (10th Cir. 2006). In Van Scoten, we pointed out that the 1,000 lb Tax Shelter brochure spent numerous pages explaining the tax benefits of investing in a Hoyt partnership and explaining why investors should trust only Hoyt's organization to prepare their individual Federal income tax returns. Another brochure, bearing the heading "Harvesting Tax Savings by Farming the Tax Code", also emphasized tax savings and explained that the investment could be financed from the investors' tax savings, which the investors otherwise would have paid to the IRS.

The partners' individual income tax returns were often prepared first by the Hoyt Tax Office to claim partnership deductions or credits sufficient to eliminate or substantially reduce a partner's tax liability. Subsequently, the partnership returns were prepared to reflect the amounts reported on the partners' individual income tax returns. The promotional materials explained that, beginning in 1982, other members of the Hoyt Tax Office would sign the individual partners' tax returns

as the preparer instead of Hoyt. If a partner needed a greater or lesser partnership loss in any year, the deductions that flowed through from the partnership were quickly adjusted within the Hoyt Tax Office without the partner's having to pay a higher fee to an outside return preparer. Hoyt routinely had the individual's Federal income tax returns prepared and filed claiming large partnership losses before the Form 1065 partnership returns were prepared and filed. Sometimes this would result in an inconsistency between the loss shown on the individual return and the amount shown on the partner's Schedule K-1. We think the workings of this scheme show that the partnership returns were signed with intent to evade the partners' individual tax liabilities through the use of false and fraudulent flowthrough partnership losses.

In summary, the record establishes by clear and convincing evidence that Hoyt knew the partnership returns contained false and fraudulent deductions and that he intended income tax to be evaded at the partner level. He was involved in every facet of the partnerships. He formed and operated the partnerships. He was involved in the alleged purchase of sheep by the partnerships from Barnes Ranches. He was involved in the unusual manner in which the partnership and individual returns were prepared. He knew that the bills of sale which purportedly identified the sheep purchased by each partnership listed large numbers of

individual breeding sheep that did not exist.  He knew that the total purchase price each sheep partnership agreed to pay for its sheep was far greater the fair market value of similar quality sheep.  He knew that the flock recap sheets identifying the partnership sheep contained false information and that the partnership records were maintained in an unreliable manner.  He knew that the deductions claimed on the partnership returns for depreciation and other farm expenses relating to the alleged sheep purchases were false and fraudulent.  He knew that the deductions claimed on the partnership returns for interest on the partnership promissory notes were false and fraudulent.  He knew that the guaranteed payment deductions claimed on the partnership returns were false and fraudulent.  He knew that he was selling the partners false and fraudulent deductions.  And he knew all these facts when he prepared and signed each of the partnership returns.

Accordingly, we hold that the 6-year statute of limitations on assessment was open under section 6229(c)(1)(B) for the 1987, 1988, and 1989 partnership returns at the time the FPAAs were issued.  The FPAAs were issued within the 6-year period for assessing the tax.  Therefore, it follows and we so hold that the FPAAs were timely issued for the 1987, 1988, and 1989 returns.

With respect to Hoyt, a partner and the TMP, who signed and participated in the preparation of the partnership returns

containing false and fraudulent items with the intent to evade tax, the periods for assessment against him individually of tax liabilities attributable to the partnership items are open indefinitely.  See sec. 6229(c)(1)(A).  Therefore, it follows, and we so hold, that the FPAAs were timely issued as to Hoyt individually for the 1984, 1987, 1988, and 1989 returns.

To reflect the foregoing,

<u>Appropriate decisions will be entered</u>.